# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HEWLETT-PACKARD
ENTERPRISE COMPANY,
HEWLETT-PACKARD
COMPANY, AND
ARUBA NETWORKS, INC.

   Plaintiffs,

v.

CHRIMAR SYSTEMS INC.
D/B/A CMS TECHNOLOGIES,

   Defendant.

Case No.

Honorable

Magistrate Judge

---

## COMPLAINT AND JURY DEMAND

Plaintiffs, Hewlett-Packard Enterprise Company and Hewlett-Packard Company (together, "HP") and Aruba Networks, Inc. ("Aruba") (collectively and each in its own right, "Plaintiffs"), hereby demand a jury trial and allege as follows for their complaint against Defendant ChriMar Systems Inc. d/b/a CMS Technologies ("ChriMar"):

# COMPLAINT

## PARTIES

1.      Hewlett-Packard Enterprise Company is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Palo Alto, CA.

2.      Hewlett-Packard Company is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Palo Alto, CA.

3.      Aruba Networks, Inc. is a corporation organized under the laws of the State of Delaware and maintains its principal place of business in Sunnyvale, California.  Aruba was acquired by HP in 2015.  Aruba is now a wholly-owned subsidiary of HP, but remains separately incorporated.

4.      On information and belief, ChriMar Systems, Inc. d/b/a CMS Technologies is a Michigan corporation with its principal place of business at 36528 Grand River Avenue, Suite A-1 in Farmington Hills, Michigan.

## JURISDICTION AND VENUE

5.      This action is predicated on the patent laws of the United States, Title 35 of the United States Code, with a specific remedy sought based upon the laws authorizing actions for declaratory judgment in the courts of the United States, 28

U.S.C. §§ 2201 and 2202.  This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

6.      An actual and justiciable controversy exists between ChriMar and Plaintiffs as to the noninfringement and unenforceability of U.S. Patent No. 9,812,825 ("'825 Patent") (attached as Exhibit A).  As further alleged below, ChriMar is and has been engaged in a campaign to license and enforce its patent portfolio against manufacturers and sellers of Power over Ethernet ("PoE") networking products, including Plaintiffs.  In connection with ChriMar's licensing campaign targeting PoE products, Plaintiffs are currently involved in litigation against ChriMar with respect to U.S. Patent Nos. 7,457,250 ("'250 Patent")[1], 8,155,012 ("'012 patent"), 8,942,107 ("'107 Patent"), 8,902,760 ("'760 Patent"), 9,049,019 ("'019 Patent"), and 9,019,838 ("'838 Patent")[2].  The '250 Patent litigation involves PoE products implementing the IEEE 802.3af and 802.3at standards, and Plaintiffs filed declaratory judgment actions in this district concerning the '012, '107, '760, '019, and '838 Patents.  Plaintiffs maintain that the '825 Patent is unenforceable, and is not infringed by Plaintiffs' PoE products implementing IEEE Standards 802.3af/at.

---

1.      *ChriMar Systems, Inc. v. Cisco Systems, Inc.*, No. 4:13-cv-1300-JSW (N.D. Cal.).

2.      *Hewlett-Packard Co. v. ChriMar Systems, Inc. d/b/a CMS Technologies,* No. 2-15-cv-10814 (E.D. Mich.); *Hewlett-Packard Co. v. ChriMar Systems, Inc. d/b/a CMS Technologies,* No. 2-15-cv-12565 (E.D. Mich.).

7.     This Court has personal jurisdiction over ChriMar at least because, on information and belief, ChriMar is a Michigan corporation having its principal place of business within the Eastern District of Michigan at 36528 Grand River Avenue, Suite A-1 in Farmington Hills, Michigan.  ChriMar has had substantial business contacts with Michigan including product sales to Michigan entities, and ChriMar's campaign to enforce and license its patent portfolio, including the '825 Patent, has a substantial relationship to Michigan.  ChriMar has availed itself of the laws of this district in connection with its current portfolio licensing efforts targeting PoE products, including by litigating patent infringement claims involving that portfolio in this district.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), (c) and § 1400(b) including because ChriMar is incorporated in the state of Michigan, has a regular and established place of business in the state of Michigan, and has had substantial contacts with the state of Michigan.   ChriMar Systems, Inc. (Identification Number 800003893) was incorporated in the state of Michigan on July 9, 1993 for a perpetual term under Section 284-1972 of the Business Corporation Act.  Its 2017 Annual Report lists John Austermann at 36528 Grand River Ave, Ste. A1, Farmington Hills, MI 48335 as its registered agent.  ChriMar's principal place of business is within the Eastern District of Michigan at 36528

Grand River Avenue, Suite A-1 in Farmington Hills, Michigan. ChriMar's website lists this same address as a location out of which ChriMar operates.

## BACKGROUND

**A.    CHRIMAR'S PATENTS**

9.     ChriMar's patent portfolio includes the '250 Patent, the '825 Patent, U.S. Patent No. 6,650,622 (the "'622 Patent"), U.S. Patent No. 5,406,260 (the "'260 Patent"), and others.

10.     The '825 Patent, entitled "Ethernet Device," reports that it was filed on January 1, 2015 as Application No. 14/726,940, and issued on November 7, 2017. The '825 Patent reports that it is a continuation of Application No. 13/615,726, filed on September 14, 2012, now the '019 Patent, which is a continuation of Application No. 13/370,918, filed on February 10, 2012, now the '107 Patent, which is a continuation of Application No. 12/239,001, filed on September 26, 2008, now the '012 patent, which is a continuation of Application No. 10/668,708, filed on September 23, 2003, now the '250 Patent, which is a continuation of Application No. 09/370,430, filed on August 9, 1999, now the '622 Patent, which is a continuation-in-part of application No. PCT/US99/07846, filed on April 8, 1999. The inventors named on the '825 Patent are John F. Austermann, III and Marshall B. Cummings.

11.     As alleged herein, Plaintiffs deny that the '825 Patent was duly and legally issued.

12.     On information and belief, ChriMar is the current assignee of the '825 Patent.

13.     The '825 Patent shares a common specification with its parent, the '250 Patent.

14.     As alleged herein, on information and belief, Plaintiffs believe that ChriMar asserts, and will assert, that the '825 Patent covers products with PoE functionality.

## B.    CHRIMAR'S LICENSING AND ENFORCEMENT EFFORTS TARGETING PRODUCTS WITH POWER OVER ETHERNET FUNCTIONALITY

15.     For many years, ChriMar has actively pursued a patent licensing and enforcement campaign targeting products with Power Over Ethernet ("PoE") functionality specified by certain standards promulgated by the Institute of Electrical and Electronics Engineers ("IEEE") and sellers of such products.

16.     ChriMar's licensing and enforcement campaign began in 2001, when ChriMar sued Cisco Systems, Inc. ("Cisco") in this district for allegedly infringing the '260 Patent, accusing, for example, Cisco's IP phones.[3]   ChriMar thereafter

---

3.     *ChriMar Sys., Inc. v. Cisco Sys., Inc.*, No. 2:01-cv-71113 (E.D. Mich.) (filed Mar. 21, 2001, terminated Sept. 15, 2005).

claimed that the '260 Patent was "essential" to the IEEE PoE standards.[4]  ChriMar also sued D-Link Systems ("D-Link")[5], Foundry Networks ("Foundry")[6],  and PowerDsine, Ltd. ("PowerDsine")[7], based on their respective sales of products with PoE functionality accusing those companies of infringing the '260 Patent based on sales of those products.  D-Link and PowerDsine took licenses to the '260 Patent after favorable rulings were issued, and ultimately an additional claim of the '260 Patent (claim 17) was invalidated by the Court in the Foundry action, leading to dismissal of that action and summary affirmance by the Federal Circuit.

17.     Shortly after issuance of the '250 Patent, which ChriMar deliberately failed to disclose to the IEEE standards bodies that developed the PoE standards, as alleged below, ChriMar continued its licensing and enforcement campaign against sellers of products with PoE functionality, including HP and a number of other California-based companies.  ChriMar sued Waters Network Systems, LLC for allegedly infringing the '250 Patent in 2008, and went on to sue multiple additional sellers of products with PoE functionality (Danpex Corp., Garrettcom,

---

4.     *See* ChriMar Letter of Assurance, *available at* http://standards.ieee.org/about/sasb/patcom/loa-802_3af-chrimar-03Dec2001.pdf.

5.     *See ChriMar Sys., Inc. v. D-Link Sys., Inc.*, No. 2:06-cv-13937 (E.D. Mich.) (filed Sept. 6, 2006, terminated Apr. 21, 2010).

6.     *See ChriMar Sys., Inc. v. Foundry Networks, Inc.*, No. 2:06-cv-13936 (E.D. Mich.) (filed Sept. 6, 2006, terminated Aug. 1, 2012).

7.     *ChriMar Sys., Inc. v. PowerDsine LTD.*, No. 2:01-cv-74081 (E.D. Mich.) (filed Oct. 26, 2001, terminated Mar. 31, 2010).

Inc., and Edgewater Networks) in 2009.[8]  Following conclusion of a reexamination proceeding involving the '250 Patent, ChriMar sued HP, and also California-based Cisco, Avaya, Inc., and Extreme Networks, both in the International Trade Commission,[9] and in district court,[10] for allegedly infringing the '250 Patent by selling products with PoE functionality, including among other products, IP telephones, wireless access points, and wireless network cameras.

18.    ChriMar has also expanded its licensing and enforcement campaign against products with PoE functionality to include the '012 Patent, which issued in 2012.  ChriMar subsequently filed five actions in the United States District Court for the Eastern District of Texas alleging infringement of the '012 Patent by various manufacturers and re-sellers of PoE products.  The complaints in these actions accuse specific models of IP phones and/or Wireless Access Points, each of which includes PoE functionality.

---

8.    *See ChriMar Sys., Inc. v. Waters Network Sys., LLC*, No. 2:08-cv-00453 (E.D. Tex.) (filed Nov. 25, 2008, terminated June 19, 2009); *ChriMar Sys., Inc. v. Danpex Corp.*, No. 2:09-cv-00044 (E.D. Tex.) (filed Feb. 6, 2009, terminated May 20, 2009); *ChriMar Sys., Inc. v. Garrettcom, Inc.*, No. 2:09-cv-00085 (E.D. Tex.) (filed Mar. 23, 2009), No. 3:09-cv-04516 (N.D. Cal.) (terminated Dec. 22, 2009); *ChriMar Sys., Inc. v. KTI Network, Inc.*, No. 2:09-cv-00230 (E.D. Tex.) (filed July 30, 2009, terminated Nov. 25, 2009).

9.    *In the Matter of Certain Communication Equipment, Components Thereof, and Products Containing the same, including Power over Ethernet Telephones, Switches, Wireless Access Points, Routers and other Devices Used in LANs, and Cameras*, Inv. No. 337-TA-817 (instituted Dec. 1, 2011, terminated Aug. 1, 2012).

10.    *ChriMar Systems, Inc. v. Cisco Systems, Inc.*, No. 4:13-cv-1300-JSW (N.D. Cal.) ("the NDCA case").

19.    ChriMar brought suit against Aastra Technologies Limited and Aastra USA Inc. in the Eastern District of Texas, Case No. 6:13-cv-879, on November 8, 2013, alleging infringement of the '012 Patent, for among other things, making, using, offering for sale, selling, and/or importing IP telephones, which, on information and belief, include PoE functionality.

20.    ChriMar brought suit against Alcatel-Lucent, Inc., Alcatel-Lucent USA, Inc., and Alcatel-Lucent Holdings, Inc., in the Eastern District of Texas, Case No. 6:13-cv-880, on November 8, 2013, alleging infringement of the '012 Patent, for among other things, making, using, offering for sale, selling, and/or importing wireless access points, which, on information and belief, include PoE functionality.

21.    ChriMar brought suit against AMX, LLC, in the Eastern District of Texas, Case No. 6:13-cv-881, on November 8, 2013, alleging infringement of the '012 Patent, for among other things, making, using, offering for sale, selling, and/or importing wireless access points, which, on information and belief, include PoE functionality.

22.    ChriMar brought suit against Grandstream Networks, Inc., in the Eastern District of Texas, Case No. 6:13-cv-882, on November 8, 2013, alleging infringement of the '012 Patent, for among other things, making, using, offering for

sale, selling, and/or importing IP telephones and wireless network cameras, which, on information and belief, include PoE functionality.

23.    ChriMar brought suit against Samsung Electronics Co, Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications in the Eastern District of Texas, Case No. 6:13-cv-883, on November 8, 2013, alleging infringement of the '012 Patent, for among other things, making, using, offering for sale, selling, and/or importing IP telephones, which, on information and belief, include PoE functionality.

24.    On July 1 2015, ChriMar expanded its litigation campaign in the Eastern District of Texas, initiating lawsuits against *thirty-nine* defendants, alleging infringement by PoE power sourcing equipment (PSEs) and powered devices (PDs) of the '012, '107, '760, '019, and '838 patents:  Alcatel-Lucent[11], AMX, LLC[12], Aacton Technology Corp., Edgecore USA, and SMC Networks[13], Adtran & TRENDNet, Inc.[14], Advantech Corporation[15], Allworx Corp.[16], Alpha Networks, Inc.[17], Black Box Corporation[18], ASUSTek Computer International,

---

11.    6:15-cv-00614

12.    6:15-cv-00615

13.    6:15-cv-00616

14.    6:15-cv-00617

15.    6:15-cv-00618

16.    6:15-cv-00620

17.    6:15-cv-00621

Inc.[19], ASUS Computer International, Inc.[20], Buffalo Americas, Inc.[21], Costar Technologies, Inc.[22], Eagle Eye Networks, Inc.[23], Comtrend & Edimax[24], EnGenius Technologies, Inc.[25], Juniper Networks, Inc.[26], Korenix USA[27], Leviton Manufacturing Co., Inc.[28], Moxa Americas Inc.[29], Netgear, Inc.[30], NetMedia Inc.[31], Phihong USA Corporation[32], Rockwell Automation, Inc.[33], Ruckus Wireless[34], AeroHive Networks Incorporated & Dell Inc.[35], TP-Link USA Corporation[36],

---

18.   6:15-cv-00622

19.   6:15-cv-00623

20.   6:15-cv-00624

21.   6:15-cv-00625

22.   6:15-cv-00626

23.   6:15-cv-00627

24.   6:15-cv-00628

25.   6:15-cv-00629 and 640

26.   6:15-cv-00630

27.   6:15-cv-00631

28.   6:15-cv-00632

29.   6:15-cv-00633

30.   6:15-cv-00634

31.   6:15-cv-00635

32.   6:15-cv-00636

33.   6:15-cv-00637

34.   6:15-cv-00638

35.   6:15-cv-00639, which resulted in a jury verdict of non-infringement for each of the '012, '760, '107, and '838 patents

36.   6:15-cv-00641

Transition Networks[37], Huawei[38], TRENDnet[39], StarTech.com USA LLP[40], Tycon Systems, Inc.[41], VP Networks[42], WatchGuard Technologies, Inc.[43], Belden Inc., GarretCom, Inc., and Hirschmann Automation and Control, Inc.[44], Belkin International, Inc.[45], Fortinet, Inc.[46], Allied Telesis, Inc.[47], and D-Link Systems, Inc.[48]

25.    Most recently, ChriMar sued Panasonic on November 9, 2017 in the Eastern District of Texas[49], alleging infringement of the '107, '760, '838, and '825 patents.  *See* Ex. B.  ChriMar's complaint states the "Patents-in-Suit generally cover plug and play automation and/or asset control capabilities employed by certain BaseT Ethernet equipment including powered devices ('PDs') and power

---

37.    6:15-cv-00642

38.    6:15-cv-00643

39.    6:15-cv-00644

40.    6:15-cv-00645

41.    6:15-cv-00646

42.    6:15-cv-00647

43.    6:15-cv-00648

44.    6:15-cv-00649

45.    6:15-cv-00650

46.    6:15-cv-00651

47.    6:15-cv-00652

48.    6:15-cv-00653

49.    *Chrimar Systems, Inc. d/b/a CMS Technologies and ChriMar Holding Company, LLC, v. Panasonic Corporation and Panasonic Corporation of North America,* No. 6:17-cv-00637 (E.D. Tex.)

sourcing equipment ('PSEs') that comply with or are compatible with certain portions of the IEEE Standards commonly referred to as PoE Standards (e.g., the IEEE 802.3af or IEEE 802.3at standards)."  Ex. B at 6.

26.    ChriMar's complaint specifically alleges that Panasonic infringes these patents because "Defendants make, use, offer to sell, sell, and/or import Power over Ethernet powered devices and/or power sourcing equipment".  With respect to the '825 patent, the complaint specifically accuses Panasonic of infringing at least claims 5, 13, 15, 16, and 17 by "making using, offering for sale, selling, and/or importing the Accused PSE Products in the United States", and claims 40, 45, 49, 50, and 64 by "making, using, offering for sale, selling, and/or importing the Accused PD products in the United States."  Ex. B at 19.

27.    ChriMar's complaint specifically alleges that Panasonic infringes the '825 patent by virtue of claiming compliance with the IEEE 802.3af/at Standards, stating "because each of the Accused PD Products comply with the PoE Standards" (Ex. B ¶ 60), and "because each Accused PD Product is 802.3af/at compliant or compatible" (Ex. B. ¶ 65).  *See also* Ex. B., ¶¶ 55 ("Additionally, each Accused PD product ***implements Section 33.3.5.1 of the 802.3af standard***"); 56 ("***Each Accused PD Product complies or is compatible with the portions of the IEEE 802.3af standard*** that prescribe the presentation of valid detection signatures by drawing different magnitudes of DC current flow in response to at least one

electrical connection"); 60 ("***Because each Accused PD product claims IEEE 802.3af/at compliance or compatibility***, each has at least one path coupled across the contacts of the Ethernet connector…"); 63 ("***excerpts of the PoE standards demonstrate that a compliant product, such as the Accused PD Products***, will draw different magnitudes of DC current flow in response to at least one electrical connection applied to a contact, ***as required to comply with the detection and classification protocols***"); 70 ("each Accused PSE Product searches the Ethernet data link for PDs ***as required by 802.3af***"); 75 ("***An IEEE 802.3af compliant Accused PSE Product must also include a DC supply*** in order to perform detection, classification, and control of the provision of operational power to a PD"); 78 ("The Accused PSE Products detect different magnitudes of DC current flow in response to at least one electrical connection applied to contacts of an Ethernet connector, ***as required to comply with the detection and classification protocols***").

28.     ChriMar's website, www.cmspatents.com, confirms that ChriMar's licensing and enforcement campaign targets products with PoE functionality for allegedly infringing ChriMar's patents.  ChriMar's website includes a number of public statements concerning ChriMar's licensing of its patents.  Specifically, ChriMar publicly states on that website that its licensing campaign targets "PoE equipment."  ChriMar states on that website that it "is engaged in active licensing

with vendors of *PoE equipment*.  Licenses for our *patents* are being offered to manufacturers and resellers of *PoE equipment*."[50]  This same page specifically identifies the parent patents of the '825 patent, the '012 Patent, the '250 Patent, and the '622 Patent, as U.S. Patents awarded to ChriMar.  Additionally, ChriMar lists Avaya, Inc. as a licensee to the '012 Patent and '250 Patent under the heading "*PoE Licensees and Products Include*:".[51]   As alleged above, Avaya was previously a named party to '250 Patent litigation, when that action was pending in Delaware prior to transfer, but was dismissed after Avaya entered into a licensing agreement with ChriMar, which ChriMar publicly states includes a license to the '012 Patent. Further, ChriMar's website describes ChriMar's "EthernetConnect Program," which ChriMar states "allows for certain vendors of *PoE products* to receive special terms under *the Patent Licensing Program*, the EtherLock Reseller Program and/or the EtherLock OEM Program."[52]   Finally, ChriMar's website www.cmstech.com includes the statement that "CMS Technologies is *the* innovator in putting a DC current signal to the 802.3i connection.  In April of 1995 CMS received a US Patent for impressing a DC current signal onto associated current loops . . . .   The IEEE 802.3af Standards Committee now refers to this

---

50.    *Patent Licensing Program*, http://www.cmspatents.com (emphases added).

51.    www.cmspatents.com/licensees.html.

52.    *EthernetConnect Program*, http://www.cmspatents.com/

important technique as Power over Ethernet."[53]   ChriMar's actions and statements all make clear that ChriMar is targeting products with PoE functionality for allegedly infringing ChriMar's patents, including the '825 Patent.

## C.   STANDARDS IN GENERAL

29.   A technical standard is an established set of specifications or requirements that either provides or is intended to provide for interoperability among products manufactured by different entities.  Once a standard is established, competing manufacturers can offer their own products and services that are compliant with the standard.

30.   "Industry standards are widely acknowledged to be one of the engines driving the modern economy." (*See* U.S. Dep't of Justice and U.S. Fed'l Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007) at 33.)  Standards, such as those related to Power over Ethernet-enabled products, allow U.S. enterprises to create data and voice communications networks knowing that the different elements of the network will work together.  Standards help drive innovation by making new products available and insuring interoperability of components.

31.   Technical standards serve an important role in developing technologies and have the potential to encourage innovation and promote

---

53.   www.cmstech.com/power.htm.

competition.  As the technical specifications for most standards are published and broadly available, entities interested in designing, manufacturing and producing products that comply with a standard are more willing to invest heavily in the development of such products because they will operate effectively and be compatible with other products from third parties so long as their products are compliant with the published technical standard.

32.    One goal of a typical standards setting body is to create a standard that everyone in the industry can practice without the threat of patent infringement lawsuits that would prevent a company from practicing the standard.   In furtherance of this goal, most standard setting organizations have adopted intellectual property rights policies to address the problems that may arise from patent hold-up.  A patent hold-up situation can occur where, after a standard is set and compliant products are being manufactured/sold, a patentee then claims rights to the technology covered by the standard.  Typically, the royalty that a patentee may obtain from a patent license for its technology is limited in part by the availability of alternative technical approaches to perform that function.  However, if an issued standard requires the use of that patented technology, other technological approaches are generally no longer available substitutes and will no longer serve to limit the patentee's ability to demand royalties far in excess of what is warranted by the intrinsic value of the technology.  This is compounded because

companies who have designed, had made and sold standards-compliant products, such as HP, invest significant resources in developing innovative, new products that also comply with the technical standard. Even if there were an alternative standard, the costs and disruption associated with switching is typically prohibitively expensive. Such high switching costs result in "lock-in" where companies become locked into manufacturing and selling products that are in compliance with the standard. Indeed, the public comes to rely upon standards-compliant equipment which can make it prohibitively difficult to subsequently switch to alternative, non-infringing substitutes once the standard has been issued. The high cost of switching applies to all elements of the standard regardless of how small the marginal contribution of the element would be (if not required by the standard) to the functionality of a standard compliant product.

33. To address these concerns, standard setting organizations typically have policies that set forth requirements concerning, among other things: (a) the timely and prompt disclosure of intellectual property such as patents or patent applications that may claim any portion of the specifications of the standard in development (i.e., are believed to be infringed by implementing the standard (also sometimes referred to as "Essential Patent Rights")); and (b) a process of assurance by which members or participants in the standard setting organization who hold purported Essential Patent Rights commit to licensing those rights on RAND

(Reasonable and Non-Discriminatory Licensing) terms or at minimum indicate that they will not provide such licenses to any Essential Patent Rights.

34.   The timely disclosure of any arguably Essential Patent Rights and whether the holder of those rights will license those rights on RAND terms by individuals participating in the standard setting organization is critical so that those participating in the development of the standard may evaluate any and all technical proposals with knowledge of the potential licensing costs that might be incurred by anyone developing standards-compliant products.

35.   Any non-disclosure of arguably Essential Patent Rights and/or breach of RAND commitments, as ChriMar has done here, undermine the safeguards that standard setting organizations put in place to guard against abuse and to prevent patent hold-up.  By seeking to unfairly exploit intellectual property rights to technology by permitting a standard to be issued with non-disclosure of arguably Essential Patent Rights and/or breach of RAND commitments, the intellectual property owner violates the industry practice and the very commitment that led to incorporation of that technology in the first place.

36.   Failure to disclose Essential Patent Rights, as ChriMar has done here, also may lead to anti-competitive patent hold-up, where after the industry and the public have become locked-in to the standard, the patentee seeks to extract exorbitant, unreasonable or otherwise improper royalties through its improperly

obtained power over the market for the technology for the standards-compliant equipment.

## D.   THE HISTORY OF THE IEEE'S POWER OVER ETHERNET STANDARDS

37.   The IEEE is a standards setting organization for a broad range of disciplines, including electric power and energy, telecommunications, and consumer electronics.  In or about March 1999, there was a call for interest in the IEEE 802.3 working group — which sets standards for physical layer and data link layer's media access control (MAC) of wired Ethernet — to begin developing what would become the IEEE 802.3af Data Terminal Equipment (DTE) Power via Media Dependent Interface (MDI) Enhancement to the IEEE 802.3 standard ("the IEEE 802.3af amendment").  A task force was formed to field technical proposals from the industry and to create a draft standard to present to the IEEE 802.3 working group.  As part of this process, the task force held a number of meetings and received input from multiple industry participants.

38.   In or about November 2004, there was a call for interest in the IEEE 802.3 working group to begin what would become the IEEE 802.3at Data Terminal Equipment (DTE) Power via Media Dependent Interface (MDI) Enhancement to the IEEE 802.3 standard ("the IEEE 802.3at amendment").  Subsequently, a task force was formed to field technical proposals from the industry and to create a

draft standard to present to the IEEE 802.3 working group. As part of this process, the task force held a number of meetings and received input from multiple industry participants.

39. The IEEE 802.3af amendment allows for the supply of data and power over Ethernet cables to certain devices such as VoIP phones, switches, wireless access points ("WAPs"), routers, and security cameras. Generally, the IEEE 802.3af amendment defines the electrical characteristics and behavior of both Power Sourcing Equipment ("PSE"), which provide up to 15.4 watts of power, and Powered Devices ("PD"), which draw power. The IEEE 802.3at amendment is a standard meant to enhance the capabilities provided by the IEEE 802.3af amendment by allowing a PSE to provide power in excess of 30 watts to a PD.

40. The success of the IEEE's standards-setting process depends on the disclosure by participants as to whether they possess any patents or applications which they believe may be infringed by any proposed standard and whether the participant is willing or unwilling to grant licenses on RAND terms. As such, the IEEE has a "patent disclosure policy" that requires participants in the standards setting process to disclose patents or patent applications they believe to be infringed by the practice of the proposed standard. This policy is set forth in the IEEE-SA Standards Board Bylaws and the IEEE-SA Standards Board Operations Manual. Further, the IEEE's patent disclosure policy requires members and

participants to disclose intellectual property rights through a "Letter of Assurance." *See, e.g.*, IEEE, *IEEE-SA Standards Board Operations Manual* 22 (1998) ("Patent holders shall submit letters of assurance to the IEEE Standards Department (to the attention of the Staff Administrator, Intellectual Property Rights) before the time of IEEE-SA Standards Board review for approval."); *see also* IEEE, *IEEE-SA Standards Board Bylaws* 12 (1998).  The IEEE patent disclosure policy also requires those submitting a Letter of Assurance to affirmatively elect whether or not it would "enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard," or provide a license "to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."  IEEE, *IEEE-SA Standards Board Bylaws* 12 (1998).

41.    The IEEE 802.3af amendment was set on or around June 18, 2003, and the IEEE 802.3at amendment was set on or around September 11, 2009.

42.    Power over Ethernet devices that are compliant with the IEEE 802.3af and/or IEEE 802.3at amendments to the IEEE 802.3 standard include network switches that supply data and Power over Ethernet to devices such as VoIP phones, switches, WAPs, routers, and security cameras (previously referred to as "Power over Ethernet-enabled products.").  This allows buildings and other physical

infrastructure to be designed so that electrical plugs do not need to be located near where network devices are used.  Moreover, because Power over Ethernet-enabled switches that distribute power using Power over Ethernet are often supported by uninterruptible power supplies or other redundant power sources, the use of Power over Ethernet permits devices like VoIP phones to continue to receive power from a Power over Ethernet switch in the event of power outages.  The availability of this method of delivering power has driven government and private enterprise to design not only their networks, but also their physical infrastructure around Power over Ethernet-enabled products.

**E.    CHRIMAR'S        DELIBERATE        NON-DISCLOSURE, MISREPRESENTATION OF AND FALSE COMMITMENTS CONCERNING ITS PURPORTED ESSENTIAL INTELLECTUAL PROPERTY**

43.    ChriMar illegally exploited the IEEE standard setting process with respect to the IEEE 802.3af and 802.3at amendments by deliberately failing to disclose to the IEEE (a) the '825 Patent or its applications,[54] (b) ChriMar's belief of their applicability to the 802.3af or 802.3at amendments to the IEEE 802.3 standard and/or (c) ChriMar's unwillingness to license the '825 Patent or its

---

54.    The phrase "the '825 Patent or its applications" as used throughout Plaintiffs' Complaint refers to U.S. Patent No. 9,812,825 or any application to which it may purport to claim priority, including without limitation Application Nos. 13/615,726, 13/370,918, 12/239,001, 10/668,708, 09/370,430, PCT/US99/07846, or Provisional Application No. 60/081,279.

applications on RAND terms, in order to intentionally and knowingly induce the IEEE 802.3 working group to set the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard based upon technology that is purportedly covered by ChriMar's intellectual property.

44.    John Austermann, III, President and Chief Executive Officer of ChriMar and named inventor on the '825 Patent and its applications, attended certain IEEE meetings regarding the setting of the IEEE 802.3af and IEEE 802.3at amendments.  The IEEE conducted a "call for patents" at each meeting attended by Mr. Austermann.  During the meetings leading up to the setting of the IEEE 802.3af  and IEEE 802.3at amendments, Mr. Austermann, on behalf of ChriMar, made presentations at least at the July 11-12, 2000 IEEE 802.3af task force meeting in La Jolla, California, as well as the January 26-27, 2005 PoE-Plus Study Group.  Mr. Austermann failed to disclose the '825 Patent or its applications to the IEEE.  Mr. Austermann also failed to disclose to the IEEE any belief that any proposals for the IEEE 802.3 standard would be covered by the '825 Patent or its applications.

45.    Further, ChriMar submitted a Letter of Assurance to the IEEE on or about December 3, 2001, which disclosed only U.S. Patent No. 5,406,260.  *See* Letter from John Austermann, ChriMar Systems, Inc., to Secretary, IEEE-SA Standards Board Patent Committee (Dec. 3, 2001), ("Letter of Assurance")

available at http://standards.ieee.org/about/sasb/patcom/loa-802_3af-chrimar-03Dec2001.pdf.   In this letter, ChriMar promised to "grant a license to an unrestricted number of applicants on a world-wide non-discriminatory basis."  *Id.* at 1.  ChriMar, however, did not identify the '825 Patent or its applications in its December 3, 2001 letter.

46.    ChriMar failed to disclose to the IEEE the '825 Patent or its applications.  ChriMar failed to disclose that the '825 Patent or its applications covered any proposals for the IEEE 802.3af standard.  ChriMar failed to disclose to the IEEE that the '825 Patent or its applications covered any proposals for the IEEE 802.3at standard.  ChriMar failed to disclose to the IEEE its unwillingness to license the '825 Patent on RAND terms.

47.    Pursuant to IEEE standards policies applicable to ChriMar, in light of ChriMar's attendance at that IEEE meeting and ChriMar's belief as to the applicability of the '825 Patent or its applications to the IEEE 802.3af and 802.3at amendments to the 802.3 standard, ChriMar was under a duty to disclose to the IEEE  (a) the '825 Patent or its applications, (b) ChriMar's belief of their applicability to the 802.3af or 802.3at amendments to the IEEE 802.3 standard and/or (c) ChriMar's unwillingness to license the '825 Patent or its applications on RAND terms.  ChriMar failed to do so.

48.     ChriMar breached its obligations that arose from its participation in the standards setting process and those laid out in the IEEE's patent disclosure policy, as well as standard industry norms and practices, when it failed to disclose the '825 Patent or its applications to the IEEE and also when it did not inform the IEEE that it is unwilling to license such intellectual property rights on RAND terms.

49.     ChriMar's failure to disclose the '825 Patent or its applications was done knowingly and with intent to deceive and induce the IEEE and participants in the standards-setting process for the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard to adopt those standards.

50.     Due in part to ChriMar's knowing and intentional deception, the industry adopted the present form of the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, and is now locked-in to the current implementation thereof for Power over Ethernet-enabled products.  Such knowing and intentional deception was for the purpose of acquiring monopoly power over the Power over Ethernet Technology Market as defined below.  ChriMar expected that were the standard to issue with technology that it believed to be covered by its patent rights, it would have an opportunity to become an indispensible technology licensor to anyone in the world seeking to produce Power over Ethernet-enabled products.

51. ChriMar's unlawful conduct has had, and will continue to have, a substantial anticompetitive effect on the Power over Ethernet Technology Market.

52. In developing the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, IEEE participants sought to select the most appropriate technology to provide each individual function within the standard. IEEE participants evaluated whether to incorporate particular proposed technology and whether to include viable alternative competing technologies into the standard. They made these decisions based on technical and commercial merit and intellectual property considerations, including whether the proposed technology was covered by disclosed intellectual property rights and, if so, whether the party claiming such intellectual property rights had committed to license those rights on RAND terms.

53. Various companies were attempting to have their technologies, which were viable alternatives to that which ChriMar now claims is covered by the '825 Patent, considered for incorporation into the IEEE 802.3af and IEEE 802.3at amendments. For example, with respect to the IEEE 802.3af amendment, the IEEE considered technologies, that appear to be alternative technologies, which were proposed by the following companies on or around the listed dates: (a) Broadcom and Level One (September 28, 1999); (b) TDK Semiconductor (November 10, 1999); (c) Hewlett Packard (January 21, 2000); (d) Cisco Systems

(January 21, 2000); (e) Nortel Networks (January 21, 2000 and May 25, 2000); (f) Circa Communications (March 8, 2000); (g) Broadcom (November 10, 1999 and March 8, 2000); (h) Level One  (March 8, 2000 and May 25, 2000); (i) PowerDsine (March 8, 2000); and (j) Agilent Technologies (May 25, 2000).

54.    ChriMar's  nondisclosures  and  misrepresentations  resulted  in incorporation into the standard of technology over which ChriMar now alleges to have patent rights.  Had ChriMar disclosed to the IEEE the '825 Patent or its applications and the fact that ChriMar believed they would be infringed by practicing the 802.3af and 802.3at amendments to the 802.3 standard, and that ChriMar was unwilling to license the patent on RAND terms, the IEEE would have (a) incorporated one or more viable alternative technologies into the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard; (b) required ChriMar to provide a letter of assurance that it would license the '825 Patent on RAND terms; (c) decided to either not adopt any amendment to the IEEE 802.3; and/or (d) adopted an amendment that did not incorporate technology that ChriMar claims is covered by the '825 Patent.  *See, e.g.*, IEEE, *IEEE-SA Standards Board Bylaws* 12 (1998) ("IEEE standards may include the known use of patent(s), including patent applications, if there is technical justification in the opinion of the standards-developing committee and provided the IEEE receives assurance from the patent

holder that it will license applicants under reasonable terms and conditions for the purpose of implementing the standard.").

## F.    AN ACTUAL AND JUSTICIABLE CONTROVERSY EXISTS

55.    ChriMar's conduct demonstrates that it will seek to prevent Plaintiffs from manufacturing, importing, offering for sale or selling products with PoE functionality, including IP telephones, wireless access points, and wireless network cameras by alleging infringement of the claims of the '825 Patent.  For example, ChriMar's actions and course of conduct against other manufacturers of products with PoE functionality, including IP telephones, wireless access points, and wireless network cameras, including in the Eastern District of Texas, and ChriMar's actions and course of conduct against Plaintiffs are sufficient affirmative acts to create an actual and justiciable controversy.

56.    Further, in light of ChriMar's enforcement conduct including its website and patent infringement suits against other manufacturers of products with PoE functionality, including IP telephones, wireless access points, and wireless network cameras in the Eastern District of Texas, Plaintiffs expect to be confronted with similar allegations from ChriMar on the '825 Patent.

57.    ChriMar's allegations of infringement of the '250 Patent against Plaintiffs in the NDCA case and the ITC investigation for similar products as are accused in the Eastern District of Texas cases further create an actual and

justiciable controversy.  The '250 Patent is the parent patent to the '825 Patent, and on information and belief, Plaintiffs believe that ChriMar alleges that the '825 Patent and the '250 Patent are directed to the same technology.  Plaintiffs expect to be confronted with similar allegations from ChriMar as to the '825 Patent against their products as they have been with respect to the '250 Patent.

58.    A declaration concerning the noninfringement and unenforceability of the claims of the '825 Patent is necessary in light of the present controversy between the parties.

## FIRST COUNT

### (Declaratory Judgment of Non-Infringement of U.S. Patent No. 9,812,825)

59.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 58, inclusive.

60.    There exists an actual and justiciable controversy regarding the noninfringement of the '825 Patent by Plaintiffs.

61.    Plaintiffs have not infringed and do not infringe any valid and enforceable claim of the '825 Patent.  Accordingly, Plaintiffs request a judicial determination of their rights, duties, and obligations with regard to non-infringement of the '825 Patent.

62.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding non-infringement of the '825 Patent.

## SECOND COUNT

## (Declaratory Judgment of Unenforceability of U.S. Patent No. 9,812,825)

63.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 62, inclusive.

64.    ChriMar's hands are unclean, rendering the '825 Patent unenforceable and barring any infringement claim by ChriMar.

65.    Despite having a duty to disclose to the IEEE (a) the '825 Patent or its applications, (b) ChriMar's belief of their applicability to the 802.3af or 802.3at amendments to the IEEE 802.3 standard and/or (c) ChriMar's unwillingness to license the '825 Patent or its applications on RAND terms in connection with the 802.3af and 802.3at amendments, ChriMar knowingly and intentionally did not do so.

66.    As alleged above, ChriMar's above-referenced failures to disclose to the IEEE directly harmed Plaintiffs because Plaintiffs relied upon the standard and assurance process, and therefore ChriMar's non-disclosure, to their detriment.

67.    ChriMar now actively seeks licenses, damages and injunctive relief against manufacturers and re-sellers of products that implement the IEEE 802.3af/at standards.  ChriMar's wrongful conduct affects the balance of equities

between the litigants and equity dictates that ChriMar cannot enforce the '825 Patent in light of its intentional wrongful and deceptive conduct during the standards-setting process.

68.   ChriMar thus committed conduct involving fraud, deceit, unconscionability, and bad faith, in connection with the '825 Patent, which directly relates to the matter at issue, rendering the '825 Patent unenforceable.  A judicial declaration of unenforceability is necessary and appropriate in order to resolve this controversy.

## THIRD COUNT

### (Breach of Contract)

69.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 68, inclusive.

70.   As a participant in the IEEE standards setting process, the IEEE patent policy and bylaws required ChriMar, which entered into an express and/or implied contract with the IEEE's members, or alternatively, with the IEEE to which IEEE members and others are third-party beneficiaries, to disclose through a Letter of Assurance patents or patent applications that it believed were infringed by the practice of the proposed standard.  ChriMar was also required in that Letter of Assurance to affirmatively elect whether or not it would "enforce any of its present

or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard," or provide a license "to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."

71.    The IEEE rules and policies (including without limitation the IEEE's patent policy), both formal and informal, including all stipulations, amendments, modifications, requirements and representations in any form, constitute a contract between ChriMar and the IEEE's members, or alternatively between ChriMar and the IEEE, to which IEEE members and others, including but not limited to Plaintiffs, are third-party beneficiaries including because industry participants who manufacture or sell Power over Ethernet-enabled products such as Plaintiffs are the intended beneficiaries of the IEEE patent policy, which includes being informed as to whether owners of essential intellectual property rights will license such rights on RAND terms.

72.    In light of the above-referenced failures to disclose to the IEEE, ChriMar has breached its contractual obligations, memorialized in the IEEE patent policy to which Plaintiffs are both parties and intended beneficiaries.

73.    Plaintiffs have been and will continue to be damaged by ChriMar's breach of contract.   Plaintiffs have invested considerable sums bringing Power

over Ethernet-enabled products to market, which is now in jeopardy in light of ChriMar's licensing and enforcement efforts due to Plaintiffs' reliance upon the standards and assurance process and ChriMar's failures to disclose to the IEEE as alleged above.

## FOURTH COUNT

### (Unfair Business Practices Under Section 17200 of California Business & Professions Code)

74.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 73, inclusive.

75.     ChriMar has engaged in unfair competition within the meaning of Section 17200 of the California Business and Professions Code.

76.     ChriMar's conduct constitutes: (1) unlawful business acts or practices; (2) unfair business acts or practices; and (3) fraudulent business acts or practices.

77.     Plaintiffs are located in California, and one or more of ChriMar's illegal, unfair, and fraudulent acts occurred in California.  For example, and without limitation, ChriMar's President and CEO, John Austermann III, made presentations on ChriMar's behalf at least at the July 11-12, 2000 IEEE 802.3af task force meeting in La Jolla, California.  As alleged, ChriMar was required to disclose (a) the '825 Patent or its applications, (b) ChriMar's belief of their applicability to the 802.3af amendments to the IEEE 802.3 standard and/or

(c) ChriMar's unwillingness to license the '825 Patent or its applications on RAND terms at that meeting within the State of California, but failed to do so.  ChriMar's illegal, unfair and fraudulent acts have harmed and threaten to further harm California customers, consumers, and competition within California, including by seeking to increase the prices California consumers would pay for communication devices that are compliant with the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard or disrupt California consumers' ability to obtain Power over Ethernet-enabled products.

78.    As is alleged with particularity above, ChriMar committed unlawful business acts by monopolizing the Power over Ethernet Technology Market.

79.    Each of the unlawful business acts identified above have continuing anticompetitive effects in the state of California and throughout the United States.

80.    As alleged above, ChriMar engaged in unfair business practices including by: (1) attending IEEE meetings regarding the 802.3af and 802.3at amendments to the IEEE 802.3 standard while knowingly and intentionally not disclosing that it believed it had intellectual property rights that would be essential to the practice of such amendments and that it is unwilling to license on RAND terms; (2) ChriMar did not disclose its intellectual property rights and unwillingness to license on RAND terms, knowingly and in order to induce reliance on its representations as to its intellectual property rights; (3) ChriMar

knew or should have reasonably expected that its nondisclosures and misrepresentations would induce the IEEE to set the IEEE 802.3af and 802.3at amendments to the IEEE 802.3 standard as it did; and (4) ChriMar did not disclose its intellectual property rights and unwillingness to license on RAND terms and made misrepresentations in order to exploit the key advantage of the standard while at the same time attempting to side-step its disclosure obligations.

81.     ChriMar's actions seek to reduce output, prevent competition on the standardized product, raise prices, waste the time and money spent standardizing the product, and run counter to the policy of encouraging the setting of standards to promote competition.   ChriMar's actions subvert the key purpose of standard setting.   Under ChriMar's approach, only companies now licensed by ChriMar would be legally permitted to sell products or devices that are compliant with the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard.   Any current ChriMar licensees cannot meet the market demand, and could charge supra-competitive prices for the products that are compliant with the IEEE 802.3 standard that they would be able to manufacture and sell.   Customers and consumers will be harmed, either by not getting products that are compliant with the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard or having to pay an exorbitant price for one.   These actions would result in higher prices and less competition, and are therefore unfair business practices.

82.     Each of the unfair business acts identified above is unfair when the effect of the act on Plaintiffs is balanced against ChriMar's reasons, justifications, and motives for that act.

83.     Each of the unfair business acts identified above violates the policy or spirit of the antitrust laws because it harms Plaintiffs, competition, and consumers.

84.     Each of the unfair business acts identified above has continuing anticompetitive effects in California and throughout the United States.

85.     ChriMar committed fraudulent business acts by engaging in the conduct as pleaded herein that deceived the IEEE, its participants and members of the public, including but not limited to, participating and advocating for technology to be incorporated into the 802.3af and 802.3at amendments to the IEEE 802.3 standard while knowingly and intentionally not disclosing that it believed it had intellectual property rights that would be necessary to the practice of such amendments and that ChriMar was unwilling to provide RAND licenses to those alleged patent rights.  ChriMar's failures to disclose and misrepresentations were intended to induce reliance.  ChriMar knew or should have reasonably expected that its nondisclosures and misrepresentations would induce the IEEE to set the IEEE 802.3af and 802.3at amendments to the IEEE 802.3 standard.

86.     Each of the fraudulent business acts identified above has continuing anticompetitive effects in California and throughout the United States.  By reason

of ChriMar's unlawful, unfair, and fraudulent business conduct, Plaintiffs have suffered injury-in-fact and has been deprived of money or property in which it has a vested interest. Unless and until the Court enjoins such conduct, Plaintiffs' injuries in fact are irreparable, and Plaintiffs will continue to suffer injury-in-fact.

87.    The allegations set forth herein are based upon Plaintiffs' current belief and the information presently available to Plaintiffs, and are subject to change as additional evidence is obtained through discovery.

## FIFTH COUNT

### (Fraud)

88.    Plaintiffs incorporate by reference the allegations in paragraphs 1 through 87, inclusive.

89.    ChriMar's enforcement efforts suggest ChriMar's belief that the '825 Patent is necessarily infringed by products that comply with the 802.3af and 802.3at amendments to the IEEE 802.3 standard. If the '825 Patent were necessarily infringed as alleged by ChriMar, then ChriMar was under a duty to disclose to the IEEE the '825 Patent or its applications to the IEEE and/or ChriMar's position as to whether or not it would license the '825 Patent or its applications on RAND terms. ChriMar had a duty to disclose to the IEEE the '825 Patent or its applications and/or whether it would be willing to license the '825 Patent or its applications to an unrestricted number of applicants on RAND terms

or that it is unwilling to grant licenses on RAND terms. ChriMar, however, knowingly and intentionally hid and did not disclose to the IEEE (a) the '825 patent or its applications, (b) ChriMar's belief of their applicability to the 802.3af or 802.3at amendments to the IEEE 802.3 standard, and (c) ChriMar's unwillingness to license the '825 Patent or its applications to an unrestricted number of applicants on RAND terms.

90.   For example, and without limitation, ChriMar representatives including the named inventor, John Austermann, III, attended a number of IEEE meetings with respect to the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, including at least a January 2000 meeting in La Jolla, California, and a January 2005 meeting in Vancouver, British Columbia. Pursuant to IEEE standards policies applicable to ChriMar representatives including the named inventor, John Austermann, III, in light of attendance at these IEEE meetings and ChriMar's representatives' belief as to the applicability of the '825 Patent or its applications to the IEEE 802.3af and IEEE 802.3at amendments to the 802.3 standard, ChriMar's representatives including John Austermann, III were under a duty to disclose to the IEEE the '825 Patent or its applications and their belief as to applicability to the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, or ChriMar's unwillingness to license the '825 Patent or its applications to an unrestricted number of applicants on RAND terms, which

ChriMar failed to do.  Further, in a December 2001 assurance letter, ChriMar further failed to disclose that it is unwilling to grant an unrestricted number of licenses to its intellectual property that it believes may be infringed by compliance with the proposed standard on RAND terms.  Instead, ChriMar represented that it would provide RAND licenses with respect to the IEEE 802.3af amendments to the IEEE 802.3 standard.

91.    Plaintiffs, other members of the IEEE, other implementers of the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, and members of the public who purchase products that implement those amendments relied to their detriment upon ChriMar's failure to disclose to the IEEE (a) the '825 patent or its applications, (b) ChriMar's belief of their applicability to the 802.3af or 802.3at amendments to the IEEE 802.3 standard, and/or (c) ChriMar's unwillingness to license the '825 Patent or its applications on RAND terms.  Based on such reliance, participants in the IEEE standards development process, including Plaintiffs' representatives, approved the issuance of the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard in their issued form, containing elements that ChriMar appears to allege are covered by the '825 Patent while simultaneously expressing an unwillingness to extend licenses on RAND terms, as opposed to implementing viable alternative technologies that were available during the standards-setting process.

92.     Plaintiffs, other implementers of the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, and members of the public who purchase products that implement those amendments, have been materially prejudiced and damaged by their reliance on ChriMar's failures to disclose in contravention of the IEEE's patent policy as set forth above.  Plaintiffs and other implementers of the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard have made very significant investments in designing, having manufactured and selling products designed based on the IEEE 802.3 standard.

93.     ChriMar knew its above-referenced nondisclosures and/or misrepresentations would induce the IEEE to adopt the IEEE 802.3af and 802.3at amendments to the IEEE 802.3 standard in their present form and that vendors of products designed based upon the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard, like Plaintiffs, would rely upon its misrepresentations including nondisclosures as to its intellectual property rights, and develop, have made and sell such products.

94.     Plaintiffs and others developed, had made and marketed their products and services in reliance on ChriMar's nondisclosures and/or misrepresentations, as described above, including investing substantial sums developing, having made and marketing products designed based upon the IEEE 802.3af and IEEE 802.3at amendments to the IEEE 802.3 standard and have suffered damages based upon

ChriMar's fraudulent actions, including the nondisclosures and/or misrepresentations identified above and additional nondisclosures and/or misrepresentations.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against ChriMar as follows:

A.     A declaration that Plaintiffs have not infringed and do not infringe in any manner any of the claims of the '825 Patent;

B.     A declaration that the '825 Patent is unenforceable and therefore without any force or effect against Plaintiffs and their officers, agents, employees and customers;

C.     A declaration that ChriMar's ability to enforce the '825 Patent is limited or barred in equity;

D.     An injunction against ChriMar and its affiliates, subsidiaries, assigns, employees, agents, or anyone acting in privity or concert with ChriMar from charging infringement or instituting any legal action for infringement of the '825 Patent against Plaintiffs or anyone acting in privity with Plaintiffs;

E.     An order declaring that Plaintiffs are the prevailing party and that this is an exceptional case, awarding Plaintiffs their costs, expenses, disbursements and

reasonable attorney fees under 35 U.S.C. § 285 and all other applicable statutes, rules and common law;

F.      Adjudge and decree that ChriMar has violated Section 17200, et seq., of the California Business and Professions Code;

G.      Enjoin, pursuant to applicable federal and state laws, including Section 17200, et seq., of the California Business and Professions Code, ChriMar's continuing violations of law by: (1) barring ChriMar from asserting the '825 Patent and other intellectual property rights it has claimed cover the IEEE 802.3af or IEEE 802.3at Power over Ethernet standards against parties manufacturing, selling, purchasing or using products practicing those standards; or in the alternative (2) requiring ChriMar to grant IEEE members, including Plaintiffs a royalty-free license to the '825 Patent and any other intellectual property rights that ChriMar has claimed are essential to practice the IEEE 802.3af or IEEE 802.3at Power over Ethernet standards;

H.      Enter judgment that ChriMar committed fraud and provide Plaintiffs damages for the fraud, as well as declare the '825 patent unenforceable based upon ChriMar's fraudulent conduct; and

I.      For such other and further relief, in law or in equity, as this Court deems just.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury as to all issues and causes of action so triable herein, pursuant to Federal Rule of Civil Procedure 38.

Dated: November 21, 2017        **KERR, RUSSELL AND WEBER, PLC**

By:  */s/ Fred K. Herrmann*
   Fred K. Herrmann (P49519)
500 Woodward Avenue
Suite 2500
Detroit, MI 48226
Telephone:  (313) 961-0200
Facsimile:  (313) 961-0388
fherrmann@kerr-russell.com

Hersh H. Mehta
MCDERMOTT WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606-0029
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
hmehta@mwe.com

*Attorneys for Hewlett-Packard Enterprise Company, Hewlett-Packard Co., and Aruba Networks, Inc.*